UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                                     :

CYNTHIA FUKELMAN, TSIPORA KUBA,        :
YOUNG SOOK SANCHEZ, BRIAN MILLER,     :
JOHN SUAREZ, TRACEY ALLEN, ARIEL        :         **REPORT AND**
DAVID, YARON GILINSKY, TOMER BITON,    :         **RECOMMENDATION**
AND ANTHONY PANZA,                   :

                                                     :         18-CV-2 (PKC)(PK)
                          Plaintiffs,        :

                                                         :
                          -against-          :

DELTA AIR LINES, INC.,                      :

                               Defendant.       :

---------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

       Cynthia Fukelman, Tsipora Kuba, Young Sook Sanchez, Brian Miller, John Suarez, Tracey

Allen, Ariel David, Yaron Gilinsky, Tomer Biton, and Anthony Panza (together, "Plaintiffs") are

current or former flight attendants who allege various employment discrimination claims against

their employer, Delta Air Lines, Inc. ("Defendant" or "Delta"). (Dkt. 1). Plaintiffs bring claims

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; 42

U.S.C. § 1981; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et

seq.*; the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* They allege discrimination on the basis of

ethnicity, age, medical leave, and/or disability, and that they were subjected to a hostile work

environment, and retaliation. The Complaint was subsequently amended three times. (Dkts. 24; 33;

Third Amended Complaint ("TAC"), Dkt. 37.)

Pending before the undersigned on referral from the Honorable Pamela K. Chen is Delta's Motion to Dismiss the TAC (the "Motion"). (Dkt. 46.)  For the reasons stated herein, the undersigned recommends that the Motion be granted.

## FACTUAL BACKGROUND

### I.    General Facts

All the facts set forth herein are taken from the TAC, unless otherwise stated, and are assumed to be true for purposes of the Motion.

Delta is one of the largest passenger air carriers in the world, with headquarters in Atlanta, Georgia.  Among its flights are those between New York and Tel Aviv, Israel (the "Israel Flight"). (TAC ¶¶ 9, 19.)

Delta offers its flight attendants the ability to give a family member or friend with whom they are "familiar" a complimentary Travel Companion Pass.  Pursuant to Delta's Travel Companion Pass Policy, the travel companion need not fly with the flight attendant, but the Travel Companion Pass cannot be used for travel for business purposes.  (*Id.* ¶ 28.)  In 2017, Delta investigated some of the Plaintiffs' compliance with the Travel Companion Pass Policy.[1]  Shortly thereafter, some of them were suspended, terminated or subjected to other forms of discipline. Delta stated that any disciplinary actions taken against Plaintiffs were based on their violations of this or another Delta policy.  (*Id.* ¶¶ 29-30, 52, 99, 140, 151, 174, 192, 213, 237.)  Most of the Plaintiffs had never been disciplined previously.

Plaintiffs, who are flight attendants with between seven and forty years of work experience, state that their status as Jewish, Israeli, or Hebrew-speaking, or their association with those who are

---

[1] Plaintiffs allege that Delta's handling of the investigation, including Delta's request that Plaintiffs keep the investigation confidential, was a violation of federal labor law prohibiting employers from limiting the "free exercise of [employees'] union rights and/or rights to organize." (*See, e.g.,* TAC ¶ 244.)  Plaintiffs do not specify which labor law was violated, and none of the seven Counts in the TAC mention any labor law violation, so this contention will not be considered.

Jewish, Israeli, or Hebrew-speaking, has subjected them to intentional discrimination by Delta in the form of termination, suspension, denial of promotion, restrictions on their travel companion benefits, or harassment and abuse. (*See e.g.*, *id.* ¶ 2.) Five of the Plaintiffs (Fukelman, Kuba, David, Gilinsky, and Biton) identify as Jewish, Israeli, or Hebrew-speaking. The remaining five Plaintiffs (Sanchez, Miller, Suarez, Allen, and Panza) are not Jewish, Israeli, or Hebrew-speaking, but associated with persons who are. (*Id.* ¶¶ 11-14, 18.) Many, but not all, of the Plaintiffs worked on the Israel Flight. (*Id.* ¶¶ 9-11, 15-18.)

Plaintiffs allege that Delta "has created a culture of anti-Semitism and directed police type actions toward Jewish, ethnic Israeli and Hebrew speaking employees and passengers traveling on flights to Tel Aviv, Israel." (*Id.* ¶ 24.) They further allege that "Delta management has sanctioned these actions by scheduling meetings with the flight attendants on the Israel Flight, wherein discrimination was exhibited, including instructions and coaching that were discriminatory and promoted prejudicial treatment toward Jewish and ethnic Israeli customers and flight attendants." (*Id.* ¶ 25.) During these meetings, only Jewish or Israeli flight attendants who worked on the Israel Flight were "criticized or threatened with discipline for wearing religious garments and yarmulkes. For example, Jewish/Israeli flight attendants were told they would be disciplined for wearing what Delta considered to be yarmulkes that were too large," and for unspecified "purported personality traits of ethnic Israelis and Jews." (*Id.* ¶¶ 46, 223, 246.) Plaintiffs attribute "discriminatory and prejudicial acts" to Delta's field service managers, including "insinuating" that Jewish, Israeli, and Hebrew-speaking flight attendants' "attire was inappropriate, when it was not." (*Id.* ¶ 26.)

Plaintiffs allege that Delta managers and employees used a derogatory nickname for the Israel Flight, calling it "'Hell Aviv'" and that Delta employees on that flight "would make fun of Jewish and Israeli passengers, including making anti-Semitic remarks, in the presence of Jewish and Israeli employees," which Delta managers ignored. (*Id.* ¶ 26.) As an example, Plaintiffs allege that

"Delta HR and managers at JFK allowed a blatantly anti-Semitic manager to harass a Jewish employee who worked on the Israel flight as a mechanic" (such as shouting, "Heil Hitler!"), and that Mr. Johnson, Delta's human resources manager at JFK Airport, was aware of the anti-Semitic and anti-Israel activities, "but failed to intervene in any meaningful way. . ."[2] (*Id.* ¶ 26.)

Some of the Plaintiffs were "subjected to harassment by management including targeted enforcement of policies that were applied only to Jewish and Israeli employees. . .includ[ing] unwarranted criticism, counseling, investigation and[] pretextual discipline. . ." (*Id.* ¶ 77; *see also id.* ¶¶ 49, 226.)

With regard to Delta's investigations into misuse of the Travel Companion Passes, Plaintiffs allege that they were targeted on a discriminatory basis, "since only Jewish, Israeli and Hebrew speaking individuals are the target of said investigations." (*Id.* ¶ 29.) The Plaintiffs who are not Jewish, Israeli or Hebrew-speaking allege that they were targeted "since only flight attendants that have Jewish, Israeli and Hebrew-speaking travel companions are the target of said investigations." (*Id.* ¶ 30.) The TAC alleges that a "Talking Points" memorandum was distributed among Delta managers explaining that they were "targeting persons with 'interest in frequent travel to Tel Aviv,' and stating that 'certain individuals' (referring to Jews and Israelis) 'who live in the New York and Atlanta area who appear to be connected in one or more ways….'" (*Id.* ¶ 32.) This memorandum further states that "Delta management, including IFS (In Flight Services – the division in charge of flight attendants) and Human Resources were investigating employees 'having possible ties to this group of people [i.e., Jews and Israelis with interests in traveling to Israel].'" (*Id.* (brackets in original))

Relevant to the age discrimination claims, Plaintiffs allege that Delta has "publicly stated that

---

[2] The actions of Mr. Johnson and others at Delta are the subject of a separate lawsuit in the Eastern District of New York. *See Amir v. Delta Air Lines, Inc.*, 18-cv-123 (PKC) (PK).

it is turning its attention to millennials, those born from the early 1980s to the later 1990s," and cites

a statement by Delta's CEO that by 2020, half of Delta's customers will be millennials, "and it is

anticipated that Delta's employees will mirror the same balance."  (*Id.* ¶ 34.)  Plaintiffs allege that

"Delta is not in a position to hire a large number of employees to fulfill their millennial goals

without removing a significant number of Delta's existing senior employee pool."  (*Id.* ¶ 35.)

Plaintiffs point to Delta's 2017 release of a reality television program called "Earning Our Wings"

about becoming a flight attendant, as supporting the company's goal of attracting younger millennial

employees.  (*Id.* ¶ 36.)

Plaintiffs allege that Delta's most recent incoming classes of flight attendants have been

predominantly under 30 years old; a flight attendant based in Detroit has observed that "incoming

classes were predominantly young people" and alleged that "it was obvious that Delta was getting rid

of older flight attendants so they could be replaced by younger ones."  (*Id.* ¶ 38.)  In addition, the

Equal Employment Opportunity Commission in Miami is investigating claims of age discrimination

against flight attendants by Delta.  (*Id.*)  Plaintiffs also cite to several other EEOC claims and a

lawsuit in the Eleventh Circuit in which Delta is accused of age discrimination against flight

attendants.  (*Id.*)

Some Plaintiffs allege that younger flight attendants are given better assignments with higher

pay over older flight attendants with more experience and seniority.  (*Id.* ¶¶ 66, 89, 123.)  They also

allege that older flight attendants are "picked on" or disciplined for trivial reasons for which

millennial flight attendants are not disciplined (*id.* ¶ 271), and that older flight attendants are

expected to complete more written reports than younger flight attendants.  (*Id.* ¶ 60.)

## II.    Facts Specific to Each Plaintiff

### A. Cynthia Fukelman

At the time of the TAC, Fukelman was a 43-year-old flight attendant with Delta for over ten

years, and resided in the Bronx, New York.  She is Jewish, Israeli, and a Hebrew speaker.  She worked on the Israel Flight.  (*Id.* ¶¶ 9, 42.)

Fukelman observed that other Delta employees would make fun of Israeli or Jewish passengers in front of her, knowing that Fukelman was Jewish.  For example, other flight attendants told Jewish or Israeli passengers that they would receive pork for dinner, knowing that was not appropriate under a Kosher diet.  (*Id.* ¶ 47.)  Fukelman is "personally aware" that non-Jewish employees and managers referred to Jewish, Israeli, or Hebrew-speaking passengers as "'these people'" and commented, "'these Jews are always complaining.'"  (*Id.* ¶ 48.)  She was subjected to the meetings where only Jewish or Israeli flight attendants were criticized or threatened with discipline, and to harassment, including the targeted enforcement.  (*Id.* ¶¶ 46, 49.)

Fukelman did not complain to Delta about any of the alleged discrimination or disparate treatment she experienced because she was afraid that she would face retaliation.  (*Id.* ¶ 50.)  She was "personally aware" that Delta had investigated, suspended, or terminated Jewish, Israeli, and Hebrew-speaking flight attendants, or flight attendants associated with Jewish, Israeli, or Hebrew-speaking passengers.  (*Id.* ¶ 51.)  Fukelman was afraid to share her travel pass with friends because she feared being investigated since the "rules would be applied differently" due to Delta's alleged anti-Semitic culture.  (*Id.*)

Fukelman was also "picked on" for being the "oldest flight attendant," and was "harassed" about the jewelry she wore.  (*Id.* ¶ 60.)  Younger flight attendants referred to her as "'Senior Mama.'" (*Id.* ¶ 59.)

Delta granted Fukelman FMLA leave during an unspecified time period for a neurological medical condition that causes severe migraine headaches.  (*Id.* ¶¶ 54-55.)  She missed a flight on an unspecified date because of a reaction to one of her medications, "which caused her to be unable to fly."  (*Id.* ¶ 52.)  Delta suspended Fukelman on March 28, 2017, and she was subsequently

terminated on an unspecified date. Delta told her that it was for missing the flight without excuse. (*Id.* ¶¶ 44, 52.)

Fukelman states that she was terminated for being Jewish, Israeli, and a Hebrew speaker, and/or as an act of retaliation based on her neurological condition disability, and/or due to her age. (*Id.* ¶ 69.) She is "personally aware" of Delta's pattern of terminating employees for pretextual reasons when they had a history of using FMLA leave. (*Id.* ¶ 56.)

**B.  Tsipora Kuba**

At the time of the TAC, Kuba was a 54-year-old Jewish, Israeli flight attendant who worked at Delta for over 21 years, including on the Israel Flight. She lives in Staten Island, New York. (*Id.* ¶¶ 10, 72, 73, 84.) Kuba has heard non-Jewish Delta employees say, "'those dirty Jews'" and complain about passengers being disruptive on the Israel Flight or praying in the aisles. (*Id.* ¶ 75.) She has "witnessed" Jewish, Hebrew-speaking, or Israeli flight attendants be wrongfully disciplined or terminated. (*Id.* ¶ 76.)

Kuba felt afraid to share her travel pass with any person she considered a friend because the rules would apply differently based on Delta's anti-Semitic policies. (*Id.* ¶ 82.)

Kuba's applications to participate in Delta's "Purser Program," a managerial program for international flight attendants, were rejected without explanation during an unspecified time frame. (*Id.* ¶¶ 85, 94.) Despite her seniority, qualifications, and experience, younger, less-experienced flight attendants have been admitted. (*Id.* ¶ 93.)

**C.  Young Sook (Suzie) Sanchez**

At the time of the TAC, Sanchez was 72 years old and had been a flight attendant for over 30 years. Sanchez is not Jewish, Israeli, or Hebrew-speaking, but she shared her travel pass with a Jewish friend. She lives in Kew Gardens, New York. (*Id.* ¶¶ 11, 97.)

Delta management would tell flight attendants that the Israeli customers were "difficult, do

not have a good reputation and that it would be a difficult flight." (*Id.* ¶ 110.)

Sanchez was referred to as "'Senior'" or "'Old Mama'" by younger flight attendants. (*Id.* ¶ 116.)

On October 11, 2017, Sanchez was suspended without pay for allegedly violating the Travel Companion Pass Policy. (*Id.* ¶ 99.) She was "personally aware" that the only employees who were investigated were those who are Jewish or close to those of Jewish ethnicity. (*Id.* ¶ 109.) On November 16, 2017, Delta gave Sanchez notice that she could return to work, but she was given a "Final Corrective Action Notice," which placed her on probation for 36 months and suspended her Travel Companion Pass benefits during the probationary period. (*Id.* ¶ 106.) As part of her probation, Sanchez was suspended from the Purser Program. (*Id.* ¶ 107.) Sanchez was allowed to return to work, but she chose not to work on the Israel Flight "as a result of her treatment by Delta." (*Id.* ¶ 108.)

### D. **Brian Miller**

Miller is a Georgia resident who has been a "dependable" flight attendant for Delta for over eleven years. (*Id.* ¶¶ 12, 133.) Miller is not Jewish, Israeli, or Hebrew-speaking, but he shared his Travel Companion Pass with a Jewish friend. (*Id.* ¶ 130.) He was aware that Jewish, Israeli, and Hebrew-speaking co-workers were targeted by Delta's management for selective enforcement of its policies, and that Jewish and Israeli employees were denied promotions. (*Id.* ¶ 132.) Miller was aware of and observed harassment by Delta management of Jewish, Hebrew-speaking, and Israeli co-workers.

Miller was questioned by Delta management on July 25, 2017 regarding his travel companion. (*Id.* ¶ 133.) Delta's line of questioning regarding how he knew his travel companion made him feel "very uncomfortable." (*Id.*) Miller was suspended without pay on September 24, 2017 for allegedly violating Delta's Travel Companion Pass Policy. (*Id.* ¶ 140.) He was terminated

on October 10, 2017.  (*Id.* ¶ 143.)

### E.  Join Suarez

Suarez is a Florida-based flight attendant who was a "devoted" employee for over twelve

years.  (*Id.* ¶¶ 13, 150.)  He is not Jewish, Israeli, or Hebrew-speaking, but he shared his Travel

Companion Pass with a Jewish friend.  (*Id.* ¶ 148.)  He was questioned by Delta on August 8, 2017

about how he knew his travel companion.  (*Id.* ¶ 150.)  He was suspended without pay on

September 24, 2017 for allegedly violating the Travel Companion Pass Policy.  (*Id.* ¶ 151.)

The suspension caused him such severe anxiety and depression that on October 10, 2017, he

notified Delta that he would be requesting disability leave.  (*Id.* ¶ 159.)

He was terminated on October 13, 2017,[3] days after making his request for disability.  (*Id.* ¶

163.)  He alleges that he was wrongfully terminated based on his travel companion's Jewish or Israeli

ethnicity, and/or he was terminated in retaliation for requesting disability leave, in violation of the

ADA or the FMLA.  (*Id.* ¶¶ 160, 165.)

### F.  Tracey Allen

Allen is a Georgia resident who worked for Delta out of Atlanta and did not work on the

Israel Flight.  She has been a flight attendant for over 18 years.  (*Id.* ¶¶ 14, 170, 174.)  She is not

Jewish, Israeli, or Hebrew-speaking, but she shared her Travel Companion Pass with a Jewish friend.

(*Id.* ¶ 169.)  Allen states that Delta stopped flying from Atlanta to Israel in approximately 2012 due

to numerous complaints by passengers of mistreatment and anti-Semitism by the flight attendants.

(*Id.* ¶ 172.)  Allen observed that on the flight from Atlanta to Israel, non-Jewish flight attendants

would complain about the way "Jews smelled" or "dressed."  (*Id.* ¶ 173.)

Allen was diagnosed with breast cancer around 2012 and was subsequently diagnosed with

---

[3] The TAC alleges that Suarez was terminated on October 13, 2018, but there are other indications in the
TAC and in the Opposition that this is a typographical error.  (*Cf.* TAC ¶ 163; Opp. at 29.)

multiple sclerosis ("MS"), which caused her to miss work and use FMLA leave.  (*Id.* ¶¶ 175, 185.) Around June 2017, she fainted while working and the plane had to make an emergency landing, which was very expensive for Delta.[4]  (*Id.* ¶ 186.)

She was questioned by Delta management on July 15, 2017 about her travel companion.  (*Id.* ¶ 187.)  She was suspended without pay on October 19, 2017, purportedly for violating the Travel Companion Pass policy.  (*Id.* ¶ 174.)  She was terminated on November 8, 2017, the same date that she was notified she was admitted into the Purser Program.  (*Id.* ¶ 178.)

### G.  **Ariel David**

David was a "faithful" flight attendant for over eleven years.  He lives in Illinois and is "of Jewish, Hebrew and Israeli ethnicity."  (*Id.* ¶¶ 15, 192.)  He gave his Travel Companion Pass to a Jewish and Israeli travel companion.  (*Id.* ¶ 194.)

While working on the Israel Flight, he heard comments about the passengers, some of which were directed at him, from non-Jewish or non-Israeli flight attendants, such as, "'these fucking Jews,'" "'these Jews are problematic,'" and "'what's up with your people, they are acting like animals.'"  (*Id.* ¶¶ 203-04.)  David observed that Delta's gate agents would often stop "orthodox and religious Jews" on the jetway while boarding, telling them that there was no more room for their carry-on luggage, when that was not true.  (*Id.* ¶ 204.)  The gate agents would force these passengers to go through their luggage to remove items used for praying.  (*Id.*)  David tried to intervene on their behalf and offered to help them find space for their luggage, but the gate agents ignored him, instead making the passengers check their bags.  (*Id.*)  David observed that only Orthodox and religious Jewish passengers were harassed and made to remove items from or check their carry-on bags.  (*Id.*)

---

[4] The TAC states that Allen fainted in June 2011, but the Opposition explains that the date was a typo.  (*See* TAC ¶ 186; Opp. at 8, n.5.)  In context, given that the next paragraph of the TAC states, "Approximately One [sic] month later, on or about July 15, 2017," the undersigned accepts that the fainting incident occurred in June 2017.  (TAC ¶ 187.)

David was suspended without pay on October 24, 2017, purportedly for violating the Travel Companion Pass Policy. (*Id.* ¶ 192.) Around November 2017, David was notified that he could return to work, but he was given a Final Corrective Action Notice, and placed on probation for 36 months, during which his Travel Companion Pass privileges were suspended. (*Id.* ¶ 196.)

### H. Yaron Gilinsky

Gilinsky is a California-based flight attendant who worked for seven years. (*Id.* ¶¶ 16, 213.) He is Jewish, Israeli and Hebrew-speaking, and so was his travel companion. (*Id.* ¶ 231.) He heard anti-Semitic comments aimed at Jewish and Israeli customers by non-Jewish or Israeli Delta employees, such as, "'those fucking Jews.'" (*Id.* ¶ 224.) On one occasion, he was told by a gate agent, "'you fucking Jews are all the same.'" (*Id.*) Gilinsky witnessed gate agents stop Orthodox and religious Jews from bringing carry-on luggage, falsely claiming that there was no more space, and making them remove religious items used for prayer. (*Id.* ¶ 225.) When Gilinsky tried to intervene, he was falsely told there was no time. (*Id.*) He heard other Delta employees laughing and joking about upsetting Jewish passengers on the Israel Flight. (*Id.*)

Gilinsky was subjected to the meetings where only Jewish or Israeli flight attendants were criticized or threatened with discipline, and to harassment, including the targeted enforcement. (*Id.* ¶¶ 223, 226.) Gilinsky was suspended without pay on October 13, 2017 and terminated on October 20, 2017.[5] (*Id.* ¶¶ 213, 216.)

Gilinsky had been approved for FMLA leave due to nerve damage in his left arm that caused numbness in his fingers. (*Id.* ¶ 228.) He used his FMLA leave to call in sick two to three times per month. (*Id.*) "On at least one occasion," he was "harassed by a representative of Delta management in front of passengers while a flight was de-boarding for requesting to use his FMLA

---

[5] The TAC states that he was terminated on October 13, 2017 and suspended without pay on October 20, 2017, but the undersigned considers this a typographical error and gives it the more logical sequence.

time." (*Id.* ¶ 229.)  He "felt that his use of FMLA made him a target for termination by Delta." (*Id.* ¶ 230.)

## I. **Tomer Biton**

Biton is a Brooklyn-based flight attendant who had over seven years of work experience, including on the Israel Flight.  (*Id.* ¶¶ 17, 246.)  Biton is Jewish, Israeli, and Hebrew-speaking, and he shared his Travel Companion Pass with a Jewish, Israeli, and Hebrew-speaking person. (*Id.* ¶¶ 235, 253.)  Biton observed Delta gate agents treating Orthodox and religious Jewish passengers differently from non-Jewish passengers, by telling them they could not bring their Kosher food onto the plane when that "was not the case." (*Id.* ¶ 248.)  Biton observed Delta employees laughing and joking about upsetting Jewish passengers on the Israel Flight. (*Id.*)  Biton heard non-Jewish and non-Israeli employees make fun of Jewish and Israeli customers, including making fun of their hygiene, and repeatedly referring to the passengers as "'these fucking Jews.'" (*Id.* ¶ 247.)  Once, a flight attendant told Biton, "'these are your people, you deal with them.'" (*Id.*)

He was subjected to the meetings where only Jewish or Israeli flight attendants were criticized or threatened with discipline, and to harassment, including the targeted enforcement. (*Id.* ¶¶ 246, 249).

Biton was questioned by Delta regarding the Travel Companion Pass Policy on September 20, 2017. (*Id.* ¶ 235.)  He was subsequently suspended without pay on an undisclosed date, and then terminated on December 21, 2017, purportedly for violating the Travel Companion Pass Policy. (*Id.* ¶ 237.)

Delta had approved FMLA leave for Biton for a panic disorder and migraines. (*Id.* ¶ 251.)  He also takes medications for stress and anxiety, and when he was not feeling well, he used his FMLA leave and called out of scheduled flights. (*Id.*)  He was "personally aware of and subject to Delta's harassment and penalization of employees who exercised their FMLA rights." (*Id.* ¶ 251.)

Delta's management "harassed" Biton "about using his FMLA leave and at times would falsely imply that he was abusing his FMLA rights."  (*Id.*)  Biton "felt that his use of FMLA made him a target for termination" by Delta.  (*Id.* ¶ 252.)

**J.  Anthony Panza**

At the time of the TAC, Panza was 54 years old, had over 30 years of experience as a flight attendant for Delta, and worked on the Israel Flight.  He is a resident of Florida.  (*Id.* ¶¶ 18, 256, 271.)  His allegations relate only to his advocacy for and association with his Jewish, Israeli, and Hebrew-speaking co-workers.  (*Id.* ¶¶ 18,259-262.)

Panza alleges that non-Jewish and non-Israeli Delta employees made fun of Jewish and Israeli customers, including making anti-Semitic and derogatory remarks, such as referring to the Israel Flight as "'Hell Aviv.'"  (*Id.* ¶ 263.)  He observed that gate agents for the Israel Flight were "purposefully argumentative with religious Jews."  (*Id.*)  Panza was "personally aware" of Delta's investigations into and subsequent suspensions and firings of Jewish, Israeli and Hebrew-speaking flight attendants, and those who associated with travel companions and employees of that ethnicity.  (*Id.* ¶ 256.)  As a result, he was "fearful of the repercussions" of sharing his Travel Companion Pass with members of that group.  (*Id.* ¶ 256.)  The termination of Jewish, Israeli, or Hebrew-speaking flight attendants caused an "atmosphere of hostility for employees on the Israel flight."  (*Id.* ¶ 258.)

Panza "routinely spoke to Delta management about, what he believed was, unfair treatment of his Jewish and Israeli co-workers on the Israel Flight."  (*Id.* ¶ 259.)  He also "regularly advocated" for these co-workers, "including reporting to managers that they were being unfairly treated and harassed."  (*Id.*)  He would "routinely raise this unfair treatment" of his co-workers "during meetings with management."  (*Id.*)  Panza alleges that he advocated for Jewish, Hebrew, or Israeli co-workers "at least from early 2017 by routinely making managers [aware]. . . of the discrimination and asking for it to stop."  (*Id.* ¶ 261.)  Among the managers he informed were a Delta Human Resources

Manager at JFK, Emily Langholz, and Delta Base Manager Bernard Rawls, who told Panza at one meeting, when he began advocating on behalf of his Jewish co-workers, "'we are not here about those Jews,'" and, "'yeah those Jews get on my nerves.'"  (*Id.* ¶ 260.)

"In or around this time," Panza also advised an unnamed human resources manager "that he believed he was being subjected to harassment and retaliation for advocating for his jewish [sic] co-workers."  (*Id.* ¶ 262.)  "HR did not investigation [sic] of Panza's complaints, but did subsequently continue to discipline Panza and put him on a 2 year corrective action notice and suspended his travel benefits."  (*Id.*)

As a result of his advocacy on behalf of his Jewish and Israeli colleagues, "Delta management targeted Panza," began to harass him, and to "falsely accuse him of rule violations, and ultimately took disciplinary action against him. . . "  (*Id.* ¶ 260.)  The disciplinary action, for which no dates are given, included "placing him on probationary status, restricting his flight benefits and right to work flights of his choosing based on his seniority. . ."  (*Id.*)  It is not clear from the TAC whether these were separate from the discipline alleged to have been imposed by Delta human resources.

In order to avoid the "hostile, stressful and intimidating anti-Semitic environment" on the Israel Flight, and "fearing further disciplinary repercussions, in or around 2017," Panza requested that he be transferred to work on a Florida flight, which was less prestigious than the Israel flight.  (*Id.* ¶ 264.)

Panza was "picked on and disciplined for trivial reasons that millennial flight attendants were not picked on or disciplined for."  (*Id.* ¶ 271.)  Management referred to him as "Senior Papa."  (*Id.*)

## PROCEDURAL BACKGROUND

Plaintiffs Fukelman, Kuba, Sanchez, and Panza filed the original complaint on January 2, 2018, alleging ethnic discrimination pursuant to 42 U.S.C. §§ 1981 and 1985.  (Dkt. 1.)  On March 16, 2018, Defendant filed a pre-motion letter, requesting leave to file a motion to dismiss pursuant

to Fed. R. Civ. P. 12(b)(6). (Dkt. 16.) The undersigned held a pre-motion conference on April 5, 2018, heard argument from both sides, and granted Plaintiffs leave to file an Amended Complaint. (Minute Entry dated April 5, 2018.)

Plaintiffs filed their first amended complaint on July 6, 2018, adding Plaintiffs Miller, Suarez, Allen, David, Gilinsky, and Biton. (Dkt. 24.) Plaintiffs also added claims for FMLA and ADA retaliation, age discrimination under the ADEA, Title VII discrimination, the NYSHRL, NYCHRL, and violation of the Georgia Age Discrimination Act, GA Code § 34-1-2. (*Id.*) Delta filed a pre-motion conference letter on July 20, 2018, summarizing arguments it would make in a Rule 12(b)(6) motion to dismiss. (Dkt. 25.) The undersigned held a pre-motion conference on October 12, 2018, and after hearing argument from both sides, permitted Plaintiffs to file a second amended complaint. (Minute Entry dated Oct. 12, 2018.)

Plaintiffs filed their second amended complaint on November 13, 2018, removing the Georgia Age Discrimination Act claim and the Section 1985 claim. (Dkt. 33.) Delta again filed a pre-motion conference letter requesting permission to file a motion to dismiss. (Dkt. 34.) The undersigned held a third pre-motion conference on December 12, 2018, at which the Court *sua sponte* granted Plaintiffs leave to file a third amended complaint to "provide additional factual allegations." (Minute Entry dated Dec. 13, 2018.)

Plaintiffs filed the TAC on January 9, 2019. (Dkt. 37.) Delta requested a pre-motion conference one more time. (Dkt. 38.) The undersigned denied the request and ordered the parties to submit a briefing schedule. (*See* Feb. 19, 2019 order.) Thereafter, Delta filed the Motion with a supporting memorandum of law (Motion, Dkt. 46; Memorandum in Support ("Def. Mem."), Dkt. 47), which Plaintiffs opposed (Response in Opposition to Motion to Dismiss for Failure to State a Claim ("Opposition" or "Opp."), Dkt. 56.) Delta replied on May 30, 2019. (Reply, Dkt. 58.)

# DISCUSSION

## I.  Standard of Review – Rule 12(b)(6)

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).  In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Id.*

The complaint must "at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed."  *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (internal quotations omitted).  Plaintiffs must still plead "facts to give 'plausible support'" to their "'minimal' initial burden'" to withstand a motion to dismiss.  *Thomson v. Odyssey House*, No. 14-CV-3857 (MKB), 2015 WL 5561209, at *5 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)).

## II.  Ethnic Discrimination

### A.  Title VII and NYSHRL

#### 1.  Legal Standard

In order to survive a motion to dismiss on a racial or ethnic discrimination claim pursuant to Title VII and the NYSHRL,[6] Plaintiffs must "plausibly allege that (1) the employer took adverse action against [them] and (2) [their] race, color, religion, sex, or national origin was a motivating

---

[6] An additional jurisdictional requirement of the NYSHRL that the alleged discrimination have an "impact" in New York state is discussed below at II.B, n.10.

factor in the employment decision." *Vega*, 801 F.3d at 86.  The "ultimate issue" in an employment

discrimination case is whether Plaintiffs can meet their burden of showing that the adverse

employment decision was motivated at least in part for a discriminatory reason.  *Id.* at 87.  At the

pleadings stage, Plaintiffs may allege facts that "directly show discrimination or facts that indirectly

show discrimination by giving rise to a plausible inference of discrimination." *Id.*  For indirect

proof, Plaintiffs must allege facts that "give plausible support to a minimal inference of

discriminatory motivation." *Littlejohn*, 795 F.3d at 311.

### a.    *Adverse Employment Action*

An adverse employment action is one that is "a *materially significant disadvantage* with respect to

the terms of the plaintiff's employment." *Littlejohn*, 795 F.3d at 312 (emphasis in original; internal

brackets and quotations omitted).  Examples include "termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular situation."

*Vega*, 801 F.3d at 85.

### b.    *Inference of Discriminatory Motivation*

"An inference of discrimination can arise from circumstances including, but not limited to,

'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious

comments about others in the employee's protected group; or the more favorable treatment of

employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Littlejohn*, 795 F.3d at 312.  Plaintiffs are permitted to plead based on "information and belief" that

they were treated differently from persons outside the protected class, but they must still plead

statements of fact, rather than mere conclusions.  *See, e.g., Williams v. Calderoni*, No. 11-CV-3020

(CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012), *aff'd sub nom. Williams v. Schwartz*, 529 F.

App'x 89 (2d Cir. 2013).  "The mere fact that something bad happens to a member of a particular

racial group does not, without more, establish that it happened *because* the person is a member of that racial group." *Id.* (emphasis in original).

"'[A]ctions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus'" may give rise to an inference of discriminatory motive. *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 436 (S.D.N.Y. 2015) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). Remarks give rise to an inference of discrimination where there is a "nexus between the remarks and an adverse employment decision." *Id.* at 438. "In determining whether a comment is 'probative of discriminatory intent," courts consider four factors: '(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . . ; and (4) the context in which the remark was made (i.e. whether it was related to the decision-making process).'" *Id.* (quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010)).

"'[P]referential treatment given to employees outside the protected class'" may also give rise to an inference of discriminatory motive. *Id.* at 436 (quoting *Chertkova,* 92 F.3d at 91). Plaintiffs do not need to provide evidence of similarly situated comparators at the motion to dismiss stage, but they must allege they were members of a protected class, and punished more severely than those outside of their protected class who were similarly situated in all material respects, and the severity of the punishment is related to their ethnicity. *McDowell v. North Shore-Long Island Jewish Health Sys., Inc.*, 839 F. Supp. 2d 562, 569 (E.D.N.Y. 2012); *Olivier v. Cty. of Rockland*, No. 15-CV-8337 (KMK), 2018 WL 401187, at *8 (S.D.N.Y. Jan. 11, 2018). Failure to identify any comparators at all, even in the motion to dismiss stage, makes the complaint vulnerable to dismissal. *See Olivier*, 2018 WL 401187, at *9 (citing *Blige v. City Univ. of New York*, No. 15-CV-8873, 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017), *R&R adopted*, 2017 WL 1064716 (S.D.N.Y. Mar. 21, 2017)).

At the pleading stage, it will ordinarily suffice to allege that Plaintiffs were replaced by

people outside of the protected class to meet the "minimal" burden of an inference of discrimination. *See Littlejohn*, 795 F.3d at 313.

However, Plaintiffs' unsupported "gut feelings" that they suffered adverse employment actions because of discrimination are insufficient to create an inference of discrimination. *See, e.g., Jackson v. City of New York*, 29 F. Supp. 3d 161, 172 (E.D.N.Y. 2014).

2.   Analysis

a.   *Adverse Employment Action*

Fukelman, Miller, Suarez, Allen, Gilinsky, and Biton were suspended, then terminated from their positions. (TAC ¶¶ 42, 44, 46, 49, 69, 74, 198, 210, 213, 216.) Sanchez and David were suspended without pay, then placed on probation for 36 months, with their travel privileges suspended; in addition, Sanchez was removed from the Purser Program. Delta placed Panza on "probationary status, restricting his flight benefits and right to work flights of his choosing based on his seniority" and "put him on a 2 year corrective action notice and suspended his travel benefits." (*Id.* ¶¶ 260, 262). Kuba alleges failure to promote based on her rejection from the Purser Program. (*Id.* ¶¶ 91, 93.)

Termination and suspension without pay are clearly adverse employment actions. *See, e.g., Vega*, 801 F.3d at 85.

Panza does not describe the "corrective action plan" he was placed on, what travel benefits he lost and whether these constitute a "material loss of benefits." *See, e.g., Vega*, 801 F.3d at 85. Likewise, Kuba does not provide sufficient information about the Purser Program to show that rejection from it constitutes an adverse employment action. However, for purposes of the Motion, and without deciding, the undersigned considers both as adverse employment actions, including Kuba's claim as a failure to promote. *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009); *Vega*, 801 F.3d at 85.

19

### b.  *Inference of Discriminatory Motivation*

(i)       *Members of the Protected Class (Fukelman, Kuba, David, Gilinsky, and Biton)*

Fukelman, Kuba, David, Gilinsky, and Biton claim that the adverse employment actions taken against them were motivated at least in part by their membership in the protected class of Jewish, Israeli, or Hebrew-speaking individuals.[7]  In the absence of direct evidence of discrimination, these plaintiffs allege that certain actions and remarks made by unspecified individuals create an inference of discriminatory motivation based on their ethnicity for the adverse employment actions taken against them.

Fukelman, Gilinsky, and Biton allege that they were subjected to meetings where only Jewish or Israeli flight attendants were threatened with discipline for wearing religious garments and yarmulkes, including those that were considered too large, and criticized for unspecified personality traits attributed to their ethnicity.  (*Id.* ¶¶ 25, 26, 46, 223, 246.)  Plaintiffs do not identify who convened the meetings, only stating that "Delta management at JFK" subjected them to "disparate treatment," including these meetings.  (*Id.* ¶¶ 46, 223.)  They do not specify when these meetings were held, who made the comments, what specifically was said, and the context in which these remarks were made.  Without allegations of these facts, Plaintiffs do not establish a connection between these meetings and the decision-making process resulting in their discipline.  *See, e.g., Mesias*, 106 F. Supp. 3d at 438 (comments made by supervisor more than year before plaintiff was fired, without any allegations that remarks were related to her termination, failed to raise inference of discrimination).

---

[7] It is undisputed that Jewish and Israeli individuals are members of a protected class under Title VII and the NYSHRL.  *Village of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) ("for purposes of Title VII, 'race' encompasses ethnicity, just as it does under § 1981"); *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.,* 968 F.2d 286, 291 (2d Cir. 1992) (Jews are considered a race under § 1981).  Plaintiffs do not allege a language-based discrimination claim separate from the claim based on ethnicity (Jewish) and nationality (Israeli).  For ease of reference, this claim is referred to as one based on ethnicity.

Fukelman, Kuba and Gilinsky allege that they were subjected to "targeted enforcement of policies that were applied only to Jewish and Israeli employees," including unwarranted criticism, counseling, and investigation. (*Id.* ¶¶ 49, 77, 226.) These allegations are conclusory and fail to "'nudge [Plaintiffs'] claims across the line from conceivable to plausible.'" *Mesias*, 106 F. Supp. 3d at 437 (quoting *EEOC v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 254 (2d Cir. 2014)). The TAC contains no dates, content, or context for the alleged criticism, how it was "unwarranted," and what constituted "counseling." It also fails to identify who made those remarks, who decided Plaintiffs would receive counseling, and whether anyone connected with the disciplinary actions against Plaintiffs were involved in these actions. If by "investigation," Plaintiffs mean the investigation into the Travel Companion Pass Policy (TAC ¶¶ 26, 49, 226, 246, 249), Plaintiffs also fail to make non-conclusory factual allegations to support their contention that members of the protected group were targeted. The TAC makes reference to a "Talking Points" memorandum which indicated that Delta would be investigating employees "'having possible ties to this group of people,'" apparently referring to those with an "'interest in frequent travel to Tel Aviv,'" and "'certain individuals'" "'who live in the New York and Atlanta area who appear to be connected in one or more ways….'" (*Id.* ¶ 32.) Omitting the conclusory inserted characterizations of this group of people as "(referring to Jews and Israelis)" and "[i.e., Jews and Israelis with interests in traveling to Israel]'," the quoted portions of this memo do not support the allegation that employees who were members of the protected class were "targeted" for investigation and discipline. (*Id.*) Plaintiffs also do not provide any specific remarks or questions during the conduct of the investigation that were ethnically degrading or could be viewed as discriminatory.

An inference of discrimination can arise from the "more favorable treatment of employees not in the protected group." *Littlejohn*, 795 F.3d at 312. Plaintiffs allege that Delta's investigation into compliance with its Travel Companion Pass Policy focused only on Jewish, Israeli and Hebrew-

speaking flight attendants (TAC ¶ 29), but Plaintiffs do not allege that other similarly situated employees were treated more favorably or even differently.  For example, they do not identify any flight attendants outside the protected class who engaged in the same conduct, but who were not investigated or were disciplined differently.[8]  *See, e.g., McDowell v. North Shore-Long Island Jewish Health Sys., Inc.*, 839 F. Supp. 2d 562, 569 (E.D.N.Y. 2012) (identification of three comparators with same job title, same supervisor, same job functions, and subject to the same standards, but treated differently).

While Plaintiffs do not need to provide *evidence* of similarly situated comparators at the motion to dismiss stage, they still bear the burden of pleading facts that they were treated more harshly than those outside their protected class who were similarly situated "in all material respects," and that this different treatment is related to their ethnicity.  *Olivier*, 2018 WL 401187, at *7 (quoting *Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 09-CV-12, 2009 WL 3682458, at *7 (S.D.N.Y. Oct. 29, 2009) and *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  Merely alleging disparate treatment in a conclusory fashion is not enough.  *See, e.g., Wolfinger v. Consol. Edison Co. of New York, Inc.*, No. 17-CV-1710 (NGG) (PK), 2018 WL 3637964, at *9 (E.D.N.Y. July 31, 2018) (failure to "plead allegations from which it is plausible to conclude that the comparators are similarly situated" where no allegations that comparator's pattern of absences were of comparable seriousness to plaintiff's) (internal quotations omitted); *Mesias*, 106 F. Supp. 3d at 438 (no inference of discrimination where only nexus with plaintiff's national origin was that coworker, for whose mistake plaintiff was blamed, was not member of plaintiff's protected class); *Williams v. N.Y.C. Health & Hosp. Corp.*, No. 08-CV-4132, 2010 WL 2836356, at *4 (E.D.N.Y. July 16, 2010) (Title VII claim dismissed where only allegation was that "[u]pon information and belief, males got paid when

---

[8] Indeed, the only facts provided in the TAC regarding other employees who were not members of the protected class suggest that they were treated the same, as the discussion below of the non-Jewish, non-Israeli, non-Hebrew-speaking Plaintiffs indicates.

they were out sick but females [did] not," and failure to "specify any facts to support [plaintiff's] claim that males were indeed treated differently than females in regard to sick-leave pay"). Plaintiffs fail to describe comparators who were similarly situated, what their responsibilities were, "'how their workplace conduct compared to theirs, or how they were treated.'" *See Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 499 (E.D.N.Y. 2019) (*quoting Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014)); *Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 768 (E.D.N.Y. 2018)). Without such facts, there can be no inference that the adverse employment decisions were connected to Plaintiffs' ethnicity.

To the extent these Plaintiffs rely on other comments that are ethnically disparaging, such as those by other flight attendants about Jewish passengers, no facts are alleged linking those comments to the disciplinary action, such that an inference of discriminatory motivation can be found. The TAC alleges that offensive remarks were made by co-workers rather than supervisors, and not by anyone connected to the decisions to impose disciplinary action on Plaintiffs. (*See, e.g.,* TAC ¶¶ 47, 75, 203, 204, 224, 247, 263.) There is no allegation, for example, that gate agents were Plaintiffs' supervisors or had any connection to any decision makers regarding any adverse employment actions against Plaintiffs. The vague allusions to "managers" making or being aware of derogatory remarks also fail to allege that they were Plaintiffs' supervisors, or in any way connected to the disciplinary decisions.

With regard to the claim of failure to promote, Kuba fails to allege any connection between the alleged anti-Semitic behavior and her denial of membership in the Purser Program. In order to survive a motion to dismiss on a failure-to-promote claim pursuant to Title VII or the NYSHRL, a plaintiff must plead that she is (1) a member of a protected class, (2) she applied and was qualified for a position in which the employer was seeking applicants, (3) she was rejected, and (4) the position remained open and the employer continued to seek applicants having the plaintiff's

23

qualifications. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 303–04 (S.D.N.Y. 2016) (quoting *Aulicino*, 580 F.3d at 80).

Kuba alleges that she has experience in the Israeli military, prior managerial experience, fluency in four languages, and an exceptional work history. (TAC ¶ 85.) However, she fails to describe the prerequisites for acceptance into the Purser Program, so she does not allege that she was actually qualified for the program. She also fails to allege that openings in the Purser Program persisted after she applied, and that Delta sought applicants with Kuba's qualifications. Indeed, despite stating that she applied to the program "three times in the past four years," she does not state when she was last rejected. She does not identify any non-Jewish or Israeli individuals who were admitted to the Purser Program instead of her, despite being similarly situated in all material respects. She alleges only that "younger less experienced flight attendants" were admitted, without providing any comparators' names or dates when they were admitted.[9] (*Id.* ¶ 84.) Kuba repeats the same conclusory allegations of "targeted enforcement of policies that were applied only to Jewish employees," that she has "witnessed and been subject to deliberate and prejudicial anti-Semitism," and that she "believes" that "within Delta's management" and "Human Resources Department" that "Jewish and ethnic Israelis have an undeserved negative reputation based on their ethnicity." (*Id.* ¶¶ 74, 75, 77.) Kuba's allegations are too vague and conclusory to allege a discrimination claim based on failure to promote.

Plaintiffs' allegations include extensive details to rebut Delta's purported reasons for suspending or terminating them, such as Plaintiffs' longstanding relationships with their travel companions. (*Id.* ¶¶ 99-105, 141-143, 152, 153, 174-177, 194, 195, 213-215, 238, 239.) They argue that the reasons Delta gave for its Travel Companion Pass investigation and the resulting adverse

---

[9] The TAC makes reference to Plaintiff Allen, who is not a member of the protected class, being accepted into the Purser Program the same day she was terminated, November 8, 2017. (TAC ¶ 178.) Nevertheless, there are no facts to support an allegation that she and Kuba are similarly situated in all material respects.

employment actions are "so objectively absurd, that significant doubts must be raised about Delta's

motivations and credibility." (Opp. at 2; *see, e.g.,* TAC ¶¶ 32, 97, 130, 148, 169, 197, 210, 222, 245.)

However, this contention does not add to the inference of discrimination. Whether a reason for the

adverse employment action is non-discriminatory or pretextual is an analysis undertaken only after

Plaintiffs have alleged facts sufficient to give "plausible support to a minimal inference of

discriminatory motivation." *Littlejohn*, 795 F.3d at 311. Without meeting that initial standard, the

burden does not shift to Defendant to show a non-discriminatory reason, let alone shift back to

Plaintiffs to demonstrate pretext. *See generally McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Accordingly, the undersigned respectfully recommends that the Title VII and NYSHRL

ethnicity discrimination claims of Fukelman, Kuba, David, Biton, and Gilinsky be dismissed.

    *(ii)*    <u>*Associational Claims (Sanchez, Miller, Suarez, Allen, and Panza)*</u>

Sanchez, Miller, Suarez, Allen, and Panza are not members of a protected class, but they

claim ethnic discrimination based on their association with Jewish friends to whom they gave Travel

Companion Passes, or, in Panza's case, with his Jewish and Israeli colleagues for whom he

"advocated." (TAC ¶¶ 97, 130, 145, 148, 169, 189, 260.)

A plaintiff may plead a claim of discrimination based on association with someone in a

protected class, even if the plaintiff is not a member of a protected class, if the discrimination

suffered is due to the plaintiff's own race. For example, in *Holcomb v. Iona Coll.*, 521 F.3d 130 (2d

Cir. 2008), the Second Circuit found that Title VII can be violated where a white plaintiff "was

discriminated against, not solely because of his own race, but as a result of his marriage to a black

woman." *Id.* at 138. There, the evidence showed that at least one of the decision-makers involved in

the plaintiff's termination made disparaging and racist remarks directly to the plaintiff about being in

an interracial marriage. *Id.* at 134. A plaintiff must be able to show that the adverse employment

action resulted because the employer disapproved of the plaintiff's association with a member of the

protected class.  *Id.* at 139.

Plaintiffs whose claims are based on associational discrimination must still meet the standards for alleging an inference of discrimination.  *Holcomb*, 521 F.3d at 139.

The Plaintiffs who allege discrimination based on their association with members of the protected class have not alleged sufficient facts to give rise to an inference of discrimination.  The non-Jewish, non-Israeli, non-Hebrew-speaking Plaintiffs allege broadly that they witnessed "harassment" of Jewish, Israeli, or Hebrew-speaking co-workers, but they provide no details about who did the harassing, what constituted such harassment, and the time-frame and context in which such incidents occurred, which link them to the adverse employment actions against these Plaintiffs.  (*Id.* ¶¶ 132, 259.)  Some of the alleged harassing comments were made several years before the disciplinary actions.  For example, Allen alleged that on a flight from Atlanta, Georgia to Tel Aviv, Israel – which was discontinued in 2012 – non-Jewish flight attendants would complain about how "Jews smelled" and "dressed."  (*Id.* ¶ 173.)  There are no further facts to support a nexus to Delta's investigation of Allen in 2017.

Significantly, no allegations give rise to an inference of discrimination based on these Plaintiffs' *association* with Jewish, Israeli and Hebrew-speaking passengers or co-workers.  All the alleged invidious remarks were about members of the protected class themselves, not about people who associated with them.  For example, Sanchez alleges that "Delta management did not think highly of Jewish, ethnic Israeli and Hebrew speaking employees or customers" and "in briefings for flights to Tel Aviv, management would tell the flight attendants that Israelis are difficult, do not have a good reputation and that it would be a tough flight."  (TAC ¶ 110.)  However, she alleges nothing about how management treated or spoke about those who, for example, were friends with Israelis.  Miller alleges that he was questioned "extensively" about his travel companion, and the line of questioning made him "very uncomfortable" (*id.* ¶133), but he provides no details about what

questions made him uncomfortable, whether they involved his association with members of the protected class, and what, if anything, was said about his association with a Jewish travel companion that could give rise to an inference of discriminatory motivation for his subsequent termination. Similarly, although Panza complains that a human resources manager at JFK, Emily Langholz, and Delta Base Manager Bernard Rawls told Panza during a meeting, "'we are not here to talk about those Jews,'" and, "'yeah those Jews get on my nerves,'" he does not allege that Langholz or Rawls's comments were directed at those who associated with Jews.  (TAC ¶ 260.)

Sanchez, Miller, Suarez, Allen, and Panza allege in a conclusory manner that the "only employees being investigated for Travel Companion Policy violations by Delta were Jewish, ethnic Israeli and Hebrew speakers or employees that had Jewish, ethnic Israeli and Hebrew speaking travel companions."  (*Id.* ¶¶ 29, 109.)  However, they do not allege facts regarding any similarly situated comparators who did not associate with Jewish, Israeli and Hebrew-speaking friends or co-workers, and who were punished less severely for the same alleged conduct.

Accordingly, because they have pleaded insufficient facts to give rise to an inference that associating with a person of Jewish or Israeli ethnicity was a motivating factor in the disciplinary actions against them, Plaintiffs' Title VII and NYSHRL ethnicity discrimination claims should be dismissed.

### B.  NYCHRL

Although Plaintiffs brought a claim pursuant to the NYCHRL for "discriminatory employment practices," (TAC ¶¶ 315-317), the undersigned recommends dismissal of this claim because Plaintiffs did not respond to Defendant's arguments regarding it in their Opposition, and it should therefore be deemed abandoned.  *See, e.g., Wilkinson v. New York State*, No. 18-CV-4148 (PKC) (LB), 2019 WL 5423573, at *6 n.9 (E.D.N.Y. Oct. 22, 2019) ("The Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the

claim should be dismissed.") (quoting *Lipton v. Cty. of Orange, NY*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (internal brackets and quotations omitted)).[10]

## C. Section 1981

"Section 1981 provides, in pertinent part, that '[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens ....' 42 U.S.C. § 1981(a).  This section outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 224–25 (2d Cir. 2004).

"[A] Title VII claim may be established through proof of negligence, whereas Section 1981 . . . claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York*, 29 F. Supp. 3d 161, 170 n. 10 (E.D.N.Y. 2014); *see also Patterson*, 375 F.3d at 225-27.  In addition, to prevail on a Section 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Assn. of African Am.-Owned Media, et al.*, No. 18-1171, slip op. at 13 (Mar. 23, 2020), 589 U.S. __ (2020). Because the allegations are insufficient to establish a claim of negligence or give rise to an inference of discriminatory motivation under Title VII, Plaintiffs also fail to establish that there was intentional discrimination and that their ethnicity was a but-for cause of the actions against them.

---

[10] In addition, non-residents of New York state or New York City who bring NYSHRL and NYCHRL claims must plead, and ultimately, prove, "that the alleged discriminatory conduct had an impact" in New York state (for NYSHRL claims) or New York City (for NYCHRL claims).  *Hoffman v. Parade Publs.*, 933 N.E.2d 744, 744 (2010); *see also Griffin v. Sirva, Inc.*, 76 N.E.3d 1063 (2017); *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 182 (2d Cir. 2016).  In order to have an "impact" on the state or city of New York, a plaintiff must either live within the state of New York or New York City, or work there.  *See Hoffman*, 933 N.E.2d at 744; *Griffin*, 76 N.E.3d at 1063.  None of the non-resident Plaintiffs (Miller, Suarez, Allen, David, Gilinsky, and Panza) allege that the discipline they received had an "impact" in New York.  Miller, Suarez and Allen do not allege any connection to or impact on New York at all; they did not work on the Israel Flight (Allen "never" worked on the Israel Flight (TAC ¶ 170)).  David, Gilinsky and Panza worked on the Israel Flight at some point (TAC ¶¶ 204, 223, 225, 264), but they provide no information as to how their being placed on probation or a corrective action notice, termination and suspension of travel benefits had any "impact" in New York. Without facts to support this required connection, their claims under the NYSHRL and NYCHRL fail for this additional reason.

Accordingly, the undersigned respectfully recommends that Plaintiffs' Section 1981 claims be dismissed.

## III.   Age Discrimination Claims

### A.  Legal Standard

#### 1.  ADEA

"Under the ADEA, it is unlawful for an employer to 'discriminate against any individual . . . because of such individual's age.' 29 U.S.C. § 623 (a)(1). 'A prima facie case of age discrimination requires that plaintiffs demonstrate membership in a protected class, qualification for their position, an adverse employment action, and circumstances that support an inference of age discrimination.'" *Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018).   In order to survive a motion to dismiss on an age discrimination claim under the ADEA, a plaintiff "must plausibly allege that adverse action was taken against her by her employer, and that her age was the 'but-for' cause of the adverse action . . . [a] plaintiff must supply sufficient factual material, and not just legal conclusions, to push the misconduct alleged in the pleading beyond the realm of the 'conceivable' to the 'plausible.'" *Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 31–32 (2d Cir. 2016).  Unlike Title VII claims, where plaintiff's membership in a protected class must only be a "motivating" factor in the adverse employment action taken, in age discrimination claims under the ADEA, the plaintiff's age must be the "but-for" cause. *Id.* at 32 n.1.

#### 2.  NYSHRL

The Second Circuit has assumed, but not decided (because New York courts have yet to determine the issue), that NYSHRL age discrimination claims are analyzed under the same framework as ADEA claims, and that age must be the "but-for" cause of the adverse employment action.  *See Boonmalert*, 721 F. App'x at 32; *Marcus*, 661 F. App'x at 33.

**B.** <u>Analysis</u>

Plaintiffs Fukelman, Kuba, Sanchez, and Panza allege discrimination claims under the ADEA and the NYSHRL, but they fail to allege sufficient facts to give rise to an inference of discrimination for any of the alleged adverse employment actions against them, or that age was the but-for cause of these disciplinary actions.

These Plaintiffs allege in a conclusory fashion that Delta wished to terminate older flight attendants in favor of younger ones (TAC ¶¶ 118-126), and that Delta has a "commitment" to hire younger workers. (*Id.* ¶¶ 63, 86-90, 119-122, 265-271.) Sanchez alleged a conclusion, rather than a fact, that "in order to hire younger employees Delta was going to have to make room for them in its workforce, meaning older employees were going to be forced out either voluntarily or involuntarily." (*Id.* ¶ 124.)

Where plaintiffs allege generally, without specific facts, that defendants attempt to "get 'younger' by terminating older employees and replacing them with younger hires," the Second Circuit has affirmed dismissal of complaints. *Marcus*, 661 F. App'x at 32-33. "Without more," such as names, dates, or reasons for termination of other employees, "the mere fact that an older employee was replaced by a younger one does not plausibly indicate discriminatory motive." *Id.* The TAC contains information from other lawsuits and EEOC investigations involving age-related claims against Delta, but allegations contained in unrelated litigation do not create an inference of discriminatory motivation without connection to the facts in *this* case.

Plaintiffs' allegations that younger flight attendants are given "better" assignments or treated "better" than older flight attendants with more seniority are also insufficient. They provide no details as to what those assignments are, why they are "better," and how younger flight attendants were treated in contrast to older flight attendants, let alone how that treatment was "better." (*Id.* ¶¶ 66, 85, 89, 123.) Plaintiffs also allege that they, along with other older flight attendants, were

expected to complete more written reports and report the conduct of other flight attendants more than younger flight attendants, but they do not identify the source of this expectation. (*Id.* ¶ 60.) They allege that they were "picked on and disciplined" for "trivial reasons" that millennial flight attendants were not, and younger flight attendants were not disciplined at all "under comparable circumstances." (*Id.* ¶¶ 61, 118, 271.) However, Plaintiffs have not identified any similarly situated comparator outside the protected class who was treated better based on age.

Plaintiffs' allegations that they were called "Senior" or "Old" "Mama" or "Papa" by the younger flight attendants and "management" (TAC ¶¶ 59, 116, 271), and Fukelman's puzzling allegation that she was "picked on" and "harassed" for her choice of jewelry, also fail to support their age discrimination claims. No details are provided for what jewelry was at issue and how it related to Fukelman's age. (*Id.* ¶ 60.) More importantly, no facts are alleged to create a nexus between these remarks and actions to the disciplinary actions against these Plaintiffs: there are no dates, identification of the speakers, no details of the content of these harassing statements, or the context in which they were uttered, including whether they had any connection to those who made the disciplinary decisions.

Plaintiffs' vague and conclusory allegations fail to create a reasonable inference that age was the but-for cause of their adverse employment actions.

## IV.    **FMLA and ADA Claims**

### A.  **Legal Standard**

#### 1.   Interference with FMLA

The FMLA entitles eligible employees to a total of 12 weeks of leave during any 12-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee."[11] 29 U.S.C. §§ 2612(a)(1)(D), (b). Employers may not interfere

---

[11] A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves

with employees' right to take FMLA leave.  29 U.S.C. § 2615(a)(1).  "To prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA[12]; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA."  *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 307 (2d Cir. 2017) (internal brackets omitted).

### 2. ADA Discrimination

Under the ADA, discrimination against any "qualified individual with a disability because of the disability" is prohibited.  *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001); 42 U.S.C. § 12112(a).  "To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  *Giordano*, 274 F.3d at 747.  An employer may violate the ADA by failing to provide an employee reasonable accommodation for the disability.  To state a *prima facie* claim for failure to accommodate, a plaintiff must demonstrate the first three prongs of an ADA discrimination claim, in addition to alleging that the employer refused to make the accommodation requested.  *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013).  Plaintiffs must plead sufficient facts to give rise to an inference that they were discriminated against because of their disability.  *See, e.g., Wolfinger*,

---

(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(A), (B).

[12] "To qualify as an 'eligible employee,' the employee must have been employed (1) 'for at least 12 months by the employer,' and (2) 'for at least 1,250 hours of service with such employer during the previous 12-month period.'  29 U.S.C. § 2611(2)(A)."  *Barletta v. Life Quality Motor Sales Inc.*, No. 13-CV-02480 (DLI) (ST), 2016 WL 4742276, at *3 (E.D.N.Y. Sept. 12, 2016).

2018 WL 3637964, at *11 (no facts stated that could give rise to an inference of discrimination by defendant) (citing *Giambattista v. Am. Airlines, Inc.*, 584 Fed. App'x. 23, 25 (2d Cir. 2014)).

To be considered disabled under the ADA, a plaintiff must: "(1) show that [she] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that [her] impairment substantially limits the major life activity previously identified." *Bonnen v. Coney Island Hosp.*, No. 16-CV-4258 (AMD) (CLP), 2017 WL 4325703, at *7 (E.D.N.Y. Sept. 6, 2017), *R&R adopted*, 2017 WL 4296733 (E.D.N.Y. Sept. 26, 2017) (internal quotations omitted); 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(h)(1). Unspecified disabilities, or emotional distress caused by the work environment, do not constitute disabilities under the ADA. *See, e.g., Lee v. Sony BMG Music Entm't, Inc.*, 557 F. Supp. 2d 418, 424–25 (S.D.N.Y. 2008). Working is considered a major life activity under the ADA. *See* 29 C.F.R. § 1630.2(i). In order to show that a plaintiff's impairment "substantially limits" her work, she must show that she is "significantly restricted in the ability to perform either a class of job or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 137 (E.D.N.Y. 2015). Where the complaint does not specify how the plaintiff's disability limits a major life activity, it may be subject to dismissal. *See, e.g., Thomson v. Odyssey House*, 2015 WL 5561209, at *16.

3. Retaliation Under FMLA and ADA

Both the FMLA and the ADA prohibit retaliation for opposing unlawful practices or engaging in protected activity, such as requesting FMLA leave or requesting a reasonable accommodation. *See* 29 U.S.C. § 2615 (FMLA anti-retaliation provision); 42 U.S.C. § 12203(a) (ADA anti-retaliation provision). *See, e.g., Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002).

The Second Circuit has analyzed FMLA and ADA retaliation claims under the same

33

framework employed in Title VII cases, that (1) the plaintiff engaged in a protected activity, (2) the employer had knowledge of the activity, (3) the employer took an adverse action against the plaintiff, and (4) a causal connection exists between the adverse action and the protected activity. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006). While this standard applies to ADA retaliation cases, *see Vitti v. Macy's Inc.*, 758 F. App'x 153, 158 (2d Cir. 2018) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)), the Second Circuit has also articulated a slightly different standard to establish a *prima facie* FMLA retaliation claim, that (1) the plaintiff engaged in a protected activity by exercising rights under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004); *Donnelly*, 691 F.3d at 147.

Here, the slight variation articulated in the FMLA retaliation test is immaterial, because there is no dispute that Plaintiffs were qualified for their positions.

In the context of a motion to dismiss, Plaintiffs need not plead each element of their retaliation claims. To survive a motion to dismiss, Plaintiffs must plausibly allege that "(1) [Defendant] discriminated – or took an adverse employment action – against [them], (2) 'because' [Plaintiffs have] opposed any unlawful employment practice." *Vega*, 801 F.3d. at 90. However, the standards provide "a framework for analyzing whether the plaintiff's claims for relief are plausible." *Jones v. Target Corp.*, No. 15-CV-4672 (MKB), 2016 WL 50779, at *5 (E.D.N.Y. Jan. 4, 2016).

### a. *Protected Activity*

A plaintiff must "possess a good faith, reasonable belief that he is disabled" to be engaged in protected activity under the ADA. *Pacheco v. Park S. Hotel, LLC*, No. 12-CV-9127 (PAC), 2014 WL 292348, at *4 (S.D.N.Y. Jan. 27, 2014) (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)) (internal quotations omitted). Where a plaintiff cannot establish a right

protected by the FMLA or the ADA, his or her claim must be dismissed.  *See, e.g., McGuiness v. E. W. Indus.*, 857 F. Supp. 2d 259, 265 (E.D.N.Y. 2012).

### b.  Knowledge of Protected Activity

Pleading facts sufficient to show general corporate knowledge that Plaintiffs engaged in protected activity is sufficient at the motion to dismiss stage.  *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007).

### c.  Adverse Employment Action

In the retaliation context, an adverse employment action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," or from engaging in protected conduct, such as exercising one's rights under the ADA or FMLA.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); 42 U.S.C. § 12203(b); 29 U.S.C. § 2615.  This definition covers a broader range of conduct than an adverse employment action in the discrimination context, which is limited to "discriminatory actions that affect the terms and conditions of employment." *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 69) (schedule change could matter enormously to young parent with school-age children; excluding employee from weekly training lunch may well deter employee from complaining about discrimination).

### d.  Causation

Plaintiffs must "plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action. . . [I]t is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision."  *Vega*, 801 F.3d. at 90-91.  But-for causation does not require Plaintiffs to prove that "retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 91.

"A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319–20 (internal quotations omitted).

Plaintiffs can plead an inference of retaliatory intent by demonstrating temporal proximity between their protected activity and the adverse action taken by the employer. *Donnelly*, 691 F.3d at 152. But-for causation may be established through temporal proximity. *Vega*, 801 F.3d. at 91. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," which has allowed the Court to "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). While the Second Circuit has found that a gap of five months may not be too long in a particular case, courts in the Second Circuit have routinely found that the passage of two or three months between the protected conduct and adverse employment action, "unsupported by any other allegations showing plausible retaliation," are insufficient to raise an inference of retaliation. *Soto v. Marist Coll.*, No. 17-CV-7976 (KMK), 2019 WL 2371713, at *11 (S.D.N.Y. June 5, 2019) (citing cases); *see also Vega*, 801 F.3d. at 91; *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Plaintiffs may also allege facts linking their protected activity to retaliatory acts in order to plead circumstantial evidence of causation. *See, e.g., Lebowitz v. New York City Dep't of Educ.*, 407 F. Supp. 3d 158, 177 (E.D.N.Y. 2017). However, conclusory allegations claiming that defendants increased "harassment" of plaintiffs who engage in protected activity are not sufficient to plead but-for causation. *Id.* Failure to allege statements by defendants referring to or condemning plaintiffs' protected activity indicates a lack of retaliatory animus. *Id.*

**B. Analysis**

1. FMLA Claims for Interference and Retaliation

36

Fukelman, Allen, Gilinsky, and Biton allege claims under the FMLA for interference and retaliation. (TAC ¶¶ 275-281; Opp. at 27.) In addition, Suarez alleges retaliation for requesting FMLA leave. (TAC ¶¶ 160-64; Opp. at 29.)

Fukelman, Allen, Gilinsky and Biton all requested and were granted FMLA leave at some point in their employment with Delta. (Opp. at 29). They fail to allege facts showing that they were ever denied any FMLA benefits. Fukelman does not allege that she requested to take FMLA leave when she missed the flight, nor does Allen allege that she had requested to take FMLA leave on the day she fainted at work. Without a request, there can be no denial. Gilinsky alleges no facts regarding any denial of a request to take FMLA leave. Likewise, although Biton alleges that "Delta management harassed" him about using his FMLA leave, there are no allegations that he was ever prevented from using it. (TAC ¶ 251.)

Accordingly, the Plaintiffs have not alleged a claim for interference with their FMLA rights.

With regard to retaliation, Plaintiffs also fail to allege any causal connection between their taking FMLA leave and their suspensions and terminations. Fukelman received FMLA leave at some point for a neurological medical condition that causes severe migraines. (*Id.* ¶¶ 54-55.) She missed a flight due to side effects from medication that rendered her unable to fly, but she does not state that she was using FMLA leave at that time. (*Id.* ¶ 52.) Without an allegation that she was exercising her rights under the FMLA at any particular time – either by requesting or using such leave – she fails to allege any nexus between her termination and her exercise of her FMLA rights.

Allen used FMLA leave because of breast cancer and MS, but she also fails to specify a time period when she requested or used such leave. (*Id.* ¶ 185.) She fainted on a flight in June 2017, and the plane had to make an emergency landing. (*Id.* ¶ 186; Opp. at 8 n.5.) On July 15, 2017, Delta questioned her about the use of her Travel Companion Pass and her travel companion, and she was terminated on November 8, 2017. (TAC ¶¶ 178, 187.) Allen alleges that the temporal proximity of

37

one month between the emergency landing and Delta's investigation of her suggests that she was terminated in retaliation for using her FMLA leave. (*Id.* ¶ 188.) However, Allen fails to allege that she was exercising any right under the FMLA in June 2017. The fact that she fainted while at work suggests that she was *not* exercising her FMLA right to take leave due to a serious health condition. Fainting at work is not a protected activity under the FMLA. In any event, the adverse employment action was her termination (not Delta's questioning of her), which occurred five months later. There is no allegation that Allen took FMLA leave after the fainting incident, closer in time to her termination. Without more, Allen has not shown a causal connection between her exercising a right under the FMLA and the decision to fire her.

Gilinsky used FMLA leave two to three times per month for nerve damage in his left arm that caused his fingers to go numb. (*Id.* ¶ 228.) He was suspended without pay on October 13, 2017, and subsequently terminated on an unspecified date, purportedly for violating Delta's Travel Companion Pass Policy. (*Id.* ¶¶ 213, 216.) Gilinsky states that "[o]n at least one occasion," he was "harassed by a representative of Delta management in front of passengers. . . for requesting to use his FMLA time." (*Id.* ¶ 229.) Gilinsky provides no dates for the period of his approved FMLA leave or when he last used it. He does not specify when the incident of harassment in the presence of passengers occurred, or who in Delta management engaged in that harassment. Without such information, he has not alleged any temporal proximity or other connection between those acts and his suspension and termination. Gilinsky's allegations that he was "personally aware" of Delta's harassment and penalization of employees who exercised their FMLA rights, and that he "felt" that the use of his FMLA time made him a target for termination are also insufficient to allege circumstances that give rise to an inference of retaliation. (*Id.* ¶¶ 229, 230.)

Biton used FMLA leave when he was not feeling well due to a panic disorder and migraines; he also takes medication for stress and anxiety. (*Id.* ¶ 251.) He was questioned by Delta Human

Resources on September 20, 2017 about "how well he knew his travel companion" and terminated

on December 21, 2017, purportedly for violating Delta's Travel Companion Pass Policy. (*Id.* ¶¶ 235,

237.) Biton was "personally aware" of Delta's "harassment and penalization" of employees who

used FMLA leave; he alleges that Delta management "harassed" him about using FMLA leave, and

"at times, would falsely imply that he was abusing his FMLA rights." (*Id.* ¶ 250.) Biton provides no

dates for the period of his approved FMLA leave, nor does he state when the harassment occurred,

who harassed him, what remarks were made, or any other facts to support a connection between his

taking of FMLA leave and the decision to terminate him.

Suarez was not approved for FMLA leave but alleges that his termination was in retaliation

for requesting such leave. On August 8, 2017, Suarez was "questioned" about his travel companion

by Delta management. (*Id.* ¶ 150.) He alleges that his subsequent "unjustifiable suspension" on

September 24, 2017 "caused him such severe anxiety and depression, that on or about October 10,

2017, he notified Delta that he would be requesting leave for disability." (*Id.* ¶¶ 151, 159.) He

alleges that Delta terminated him three days later, in order to avoid granting him FMLA leave.

(Opp. at 27, citing *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269 (11th Cir. 2012)).

However, Suarez has not described a "serious health condition" entitling him to benefits under the

FMLA. 29 U.S.C. § 2611(11)(A), (B). Even if he were entitled to FMLA benefits, Suarez has not

plausibly alleged that his request for FMLA leave was the but-for cause of his termination. Delta's

investigation of Suarez's compliance with its Travel Companion Pass Policy had begun more than

two months earlier, and he had already been suspended by the time Suarez gave notice of his

intention to request FMLA leave. (TAC ¶¶ 150-51, 159.) Suarez does not allege that any comments

were ever made to him regarding his request for leave. Given that he had already been investigated

and suspended, the mere temporal proximity of Suarez's "request" for FMLA leave to his ultimate

termination, with nothing more, fails to nudge his claim from conceivable to plausible, as required to

39

survive a motion to dismiss. *Port Auth. of N.Y. & N.J.*, 768 F.3d at 254.

Accordingly, Plaintiffs' claims for FMLA retaliation should be dismissed.

2.  <u>ADA Claims for Discrimination and Retaliation</u>

Plaintiffs Fukelman, Suarez, Allen, Gilinsky, and Biton allege discrimination and retaliation claims under the ADA.  Fukelman alleges that her "neurological medical condition, that causes severe migraine headaches" constitutes a disability or perceived disability under the ADA.  (TAC ¶ 54.)  Allen claims a disability based on MS.  (*Id.* ¶ 185; Opp. at 30.)  Gilinsky claims a disability based and perceived disability based on nerve damage in his left arm that would cause his fingers to go numb.  (TAC ¶ 228; Opp. at 30.)  Biton claims a disability based on a panic disorder and migraines. (Opp. at 30.)  Suarez bases his disability on severe anxiety and depression caused by his suspension. (TAC ¶ 159.)

None of the Plaintiffs, except Suarez, allege that they were denied any reasonable accommodation for their disability.  In fact, it appears that they were granted FMLA leave when requested.  The TAC is devoid of any other request for reasonable accommodation.  Suarez alleges that his request for FMLA was denied (by his termination); however, anxiety and depression caused by his suspension is not a condition that is considered a disability under the ADA.  *See, e.g., Sony BMG Music Entm't, Inc.*, 557 F. Supp. 2d at 424–25 (mental or physical fallout from alleged discrimination does not create a separate cause of action for disability discrimination) (citing cases).

Plaintiffs also have not sufficiently alleged that a retaliatory motive was the but-for cause of the adverse employment actions.  None of the Plaintiffs complained to their employer about discriminatory treatment based on disability; the only activity protected under the ADA described in the TAC are their requests for accommodation by requesting medical leave.  For the same reasons the FMLA retaliation claims fail – *i.e.*, lack of facts connecting their exercise of rights to the adverse employment actions – the ADA retaliation claims also fail.

40

Accordingly, the undersigned respectfully recommends that Plaintiffs' ADA claims for discrimination and retaliation be dismissed. [13]

## V.    Hostile Work Environment Claims

### A.    Title VII, Section 1981, NYSHRL, ADEA, FMLA, and ADA[14]

1.    Legal Standard

"To state a claim for a hostile work environment in violation of Section 1981, Title VII, NYSHRL, ADEA, FMLA, and ADA, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]." *Patane*, 508 F.3d at 113 (internal quotations omitted); *Littlejohn*, 795 F.3d at 320–21; *Fenner v. News Corp.*, No. 09-CV-9832 (LGS), 2013 WL 6244156, at *12 (S.D.N.Y. Dec. 2, 2013). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 320-21. "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment

---

[13] Although Plaintiffs make several passing allegations regarding retaliation based on ethnicity or age, (*see, e.g.,* TAC ¶¶ 261, 262, 293, 300), Plaintiffs have not argued in their Opposition that they were retaliated against on grounds other than requesting FMLA or ADA leave. (*See* Opp. at 27 (explaining the legal standard for FMLA retaliation claims).) Accordingly, the undersigned recommends that to the extent Plaintiffs have pleaded retaliation claims on other grounds, they are deemed abandoned. *See, e.g., Wilkinson,* 2019 WL 5423573, at *6 n.9.

[14] The Second Circuit has not determined whether a hostile work environment claim under the ADA or FMLA is cognizable, but courts have assumed they might be. These claims are analyzed here using the same legal analysis as for the other statutes. *See, e.g., Schmitt v. City of New York,* No. 15-CV-05992, 2018 WL 5777019, at *5 (E.D.N.Y. Nov. 1, 2018); *Spaulding v. New York City Dep't of Educ.*, No. 12-CV-3041 (KAM) (VMS), 2015 WL 12645530, at *57 (E.D.N.Y. Feb. 19, 2015), *R&R adopted*, 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015).

were thereby altered." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2001) (citing *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)).

Whether a workplace is "hostile" should be analyzed based on the totality of the circumstances. *Patane*, 508 F.3d at 113. "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. . . Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Id.* at 114 (internal quotations omitted).

Even where the discriminatory conduct is not directed at the plaintiff, it "can still contribute to the creation of an overall hostile work environment." *Id.* "Nor must offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class. Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)*, superseded on other grounds by* N.Y.C. Local L. 85. However, courts focus on the treatment of employees, rather than non-employees, in their analysis. *See, e.g., Salas v. New York City Dep't of Investigation*, 298 F. Supp. 3d 676, 684 (S.D.N.Y. 2018).

"[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Alfano,* 294 F.3d at 374 (citation and internal quotation marks omitted). In order to be deemed pervasive, incidents must generally be "more than episodic." *Id.* (citations and internal quotation marks omitted). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few

isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Fenner*, 2013 WL 6244156, at \*13 (internal quotations and citations omitted).

If the abuse is alleged to be constant, even if the details about each incident are absent, this can create a jury question on severity and pervasiveness. *Patane*, 508 F.3d at 114. "Where the harassing employee is the plaintiff's supervisor and the harassment culminates in a tangible employment action, the employer is strictly liable. On the other hand, if the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Fenner*, 2013 WL 6244156, at \*13 (internal quotations and citations omitted).

In general, "stray comments" by co-workers do not create an inference of discrimination. *Giambattista*, 584 Fed. App'x. at 25-26. Where a supervisor makes the comment, however, it could be deemed more "ominous" and may provide sufficient basis for an inference of discrimination, when considered in the totality of the circumstances. *See, e.g., Anyachebelu v. Brooklyn Hosp. Ctr.*, No. 16-CV-3159 (DLI) (VMS), 2017 WL 9511073, at \*13 (E.D.N.Y. July 20, 2017), *R&R adopted*, 2017 WL 4233033 (E.D.N.Y. Sept. 22, 2017).

2. <u>Analysis</u>

a. <u>*Hostile Work Environment Based on Ethnicity*</u>

Plaintiffs allege that various anti-Semitic statements made by other Delta employees created a hostile work environment. Fukelman alleges that non-Jewish, non-Israeli employees made fun of Jewish and Israeli customers, including telling them that pork would be served for dinner. (TAC ¶ 47.) "Employees and managers" would call the Israel Flight "'Hell Aviv'" and say things like, "'Jews are always complaining'" and "'these people,'" in Fukelman's presence, knowing she is Jewish,

Israeli, and Hebrew-speaking. (*Id.* ¶ 48.) Kuba witnessed non-Jewish, non-Israeli employees complaining about "Jews being disruptive and about religious Jews praying in the aisle during the flight," and she has "often" overheard non-Jewish employees refer to passengers as "'those dirty Jews.'" (*Id.* ¶ 75.) David heard non-Jewish and non-Israeli employees repeatedly say in his presence, "'these fucking Jews'" and "'these Jews are problematic.'" (*Id.* ¶ 203.) On one occasion, he was told by another flight attendant, "'what's up with your people, they are acting like animals.'" (*Id.*) Gilinsky alleges that Delta employees made fun of Jewish and Israeli customers, including by mocking their clothing and hygiene, and referred to them as "'those fucking Jews'" in Gilinksy's presence. (*Id.* ¶ 224.) He was once told by a gate agent, "'you fucking Jews are all the same.'" (*Id.*) Biton also heard comments by non-Jewish, non-Israeli employees, such as "'these fucking Jews,'" and on one occasion, he was told by a flight attendant, "'these are your people you deal with them.'" (*Id.* ¶ 247.)

Sanchez states that "management" would tell flight attendants on the Israel Flight that "Israelis are difficult, do not have a good reputation and that it would be a tough flight." (*Id.* ¶ 110.) Miller alleges "harassment" of his Jewish, Israeli, and Hebrew-speaking colleagues, without providing any detail. (*Id.* ¶ 132.) Allen alleged comments made in or before 2012 about how "Jews smelled" or "dressed." (*Id.* ¶ 173.) Panza alleges that Delta Base Manager Rawls stated, "'those Jews get on my nerves.'" (*Id.* ¶ 260.)

In addition, David, Gilinsky, and Biton allege that they observed gate agents stopping only Orthodox and religious Jews and falsely telling them that their carry-on luggage could not fit on the plane. Gate agents also told passengers they could not bring Kosher food onto the plane, which was not true. Gate agents would force customers to remove items used for praying. (*Id.* ¶¶ 204, 225, 248.) When David, Gilinsky, and Biton tried to intervene on behalf of the customers, the gate agents would ignore them, or say there was not enough time, when they knew that was not true. (*Id.*

¶¶ 204, 225, 248.)  Gilinsky and Biton alleged that "the Delta employees would laugh and joke about upsetting the Jewish passengers on the Israel Flight."  (*Id.* ¶¶ 225, 248.)  Plaintiffs do not allege how often or when they observed this behavior, nor do they identify the perpetrators.

Plaintiffs also allege that comments, such as, "'Heil Hitler!'" made by the manager of a Jewish mechanic who worked on the Israel Flight (that are the subject of another lawsuit against Delta), support their hostile work environment claim.  (*Id.* ¶ 26; Opp. at 10.)

Despite the numerous specific remarks alleged, Plaintiffs fail to show that they were severe or pervasive, such that they created an environment that a reasonable person would find hostile or abusive.  Plaintiffs do not state the quantity or frequency of any of the comments, who made them, when they were made, or whether any of those individuals supervised them or were involved in imposition of their adverse employment actions.  The remarks are attributed generally to fellow flight attendants or gate agents, not Plaintiffs' supervisors.  The only individuals identified as making any offending statements – Human Resources Manager at JFK Langholz and Delta Base Manager Rawls – are not alleged to be Plaintiffs' supervisors.  Statements attributed to Delta "management" that Israelis are difficult are also not attributed to anyone supervising any of the Plaintiffs.  At most, the comments described by Plaintiffs constitute "stray remarks," which do not create a claim for hostile work environment based on ethnicity.

The TAC fails to allege the time period during which these remarks were made.  Allen, for example, repeats statements that were made when there were still flights from Atlanta to Israel – in or before 2012.  If all the comments identified in the TAC were spread out over a long period of time, it would be hard to characterize them as constituting a "steady barrage of opprobrious racial comments, rather than sporadic slurs."  *Fenner*, 2013 WL 6244156, at *13.  Moreover, while Plaintiffs characterize the statements and actions as occurring more than once – "often," "frequently," "repeatedly" (TAC ¶¶ 75, 204, 225, 247, 248) – they do not allege that they occurred on a constant,

concerted, or steady basis, such that they were more than isolated incidents.

The comments themselves are not threatening or humiliating. While offensive, mocking, and based on stereotypes, they appear to be expressions of petty annoyance rather than containing threats. No single comment made to Plaintiffs or in their presence was so extraordinarily severe that it, standing alone, created a hostile work environment by transforming their workplace. *See, e.g., Alfano*, 294 F.3d at 374 (examples of single severe incident include "vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes," or a "single sexual assault").

The remarks were also not usually directed at Plaintiffs or other employees, but rather at customers. *See, e.g., Salas*, 298 F. Supp. 3d at 684 (dismissing hostile work environment claim where fingerprint unit employee alleged discriminatory conduct directed at non-employee who was being fingerprinted). Although Fukelman, David, Biton, and Gilinsky alleged that co-workers made at least one comment directly to them referencing their ethnicity or religion (TAC ¶¶ 47, 203, 204, 247, 224), as discussed above, none of these comments rises to the level of severity or pervasiveness such that they created a hostile work environment. *See, e.g., Alfano,* 294 F.3d at 374.

In short, Plaintiffs do not allege harassment of such quality or quantity that a reasonable employee would find the conditions of their employment altered for the worse.

In addition, none of the Plaintiffs allege that they were subjectively offended by the comments. The only reaction alleged by any of the Plaintiffs is described by Fukelman, who states that the remarks were "quite offensive to many passengers," but says nothing about her subjective reaction. (TAC ¶ 47.)

The non-Jewish, non-Israeli, non-Hebrew-speaking Plaintiffs also fail to allege a hostile work environment based on their association with members of the protected class. None of the remarks

46

alleged in the TAC are about anyone who *associates* with Jewish, Israeli or Hebrew-speaking persons, rather than members of the class themselves. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 517 (6th Cir. 2009) (no associational hostile work environment claim where few of the discriminatory comments and acts "were directed at [non-African-American plaintiff] or toward those who associated with or advocated for African-Americans; rather, they were harassing toward African–Americans themselves").

Moreover, none of the Plaintiffs alleged that the comments or conduct about Jewish and Israeli customers and co-workers were so severe or pervasive that they altered the terms of Plaintiffs' employment for the worse. *See, e.g., Marshall v. Kingsborough Cmty. Coll. of Cuny,* No. 11-CV-2686 (PKC) (RML), 2015 WL 5773748, at *10 (E.D.N.Y. July 27, 2015), *R&R adopted*, 2015 WL 5774269 (E.D.N.Y. Sept. 30, 2015). For example, they do not allege how not being able to help a passenger bring religious items onboard constitutes such an alteration.

The TAC contains descriptions of several offensive comments made by an unidentified "manager" of a Jewish mechanic for the Israel Flight, which are the subject of a separate litigation against Delta. (TAC ¶ 26; Opp. at 10.) However, no allegations connect these remarks to Plaintiffs' employment. Plaintiffs do not allege that this individual was *their* manager or the manager of flight attendants, or indeed had any contact with Plaintiffs. They do not allege that they shared the same work environment with the mechanic to whom these comments were directed. Plaintiffs do not allege that they heard these statements or heard about them through co-workers, such that the remarks created an environment that Plaintiffs perceived as hostile. Plaintiffs do not allege how any of these remarks altered the terms and conditions of their employment. *See, e.g., Fenner,* 2013 WL 6244156, at *15 ("in order to be relevant, harassment not personally observed must have occurred in the same work environment that Plaintiffs inhabited and … must have affected the terms and conditions of Plaintiffs' employment adversely.") (citing *Leibovitz,* 252 F.3d at 190).

47

Even if all three of prongs for a hostile work environment were met, there are no allegations of fact to support negligence by Delta in controlling the environment. The TAC does not indicate that Delta knew or should have known about hostile or abusive remarks and allowed them to continue. *See, e.g., Fenner*, 2013 WL 6244156, at *13; *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998) ("An employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it.") Fukelman, for example, specifically states that she did not bring allegedly discriminatory acts to Delta's attention because she was afraid of retaliation. (TAC ¶ 50.) Plaintiffs make conclusory allegations that employees made anti-Semitic remarks in the presence of Jewish and Israeli co-workers, which Delta managers "ignored," but fail to provide details of when the remarks were made, who was present, and what role those "managers" played in controlling the environment or conveying information to the employer. (*Id.* ¶ 26.) Panza alleges that he told an unnamed human resources manager about the conditions, but he does not state what he reported and when. (*Id.* ¶ 262.) Such vague allegations are insufficient to create an inference of negligence by the employer. The TAC also contains allegations from an unrelated lawsuit that Eric Johnson, Delta's human resources manager at JFK, was aware of anti-Semitic and anti-Israel activities and failed to intervene, but, as with the allegations regarding the mechanic's manager, there is no connection made to Plaintiffs in this case. (*Id.* ¶ 26.)

Accordingly, based on the totality of the circumstances, the undersigned respectfully recommends that Plaintiffs' Title VII, Section 1981, and NYSHRL hostile work environment claims be dismissed.

b. *Age-Based Hostile Work Environment*

Fukelman, Kuba, Sanchez and Panza fail to state a claim for hostile work environment based on age pursuant to the ADEA or the NYSHRL. Kuba has not alleged any age-based comments or conduct. Fukelman, Sanchez, and Panza have alleged only that some flight attendants or unnamed

"management" called them "Senior" or "Old" "Mama" or "Papa," and some unnamed employees criticized Fukelman for her choice of jewelry.

All the age-based comments Plaintiffs allege are "stray remarks" and do not rise to the level of an objectively severe or pervasive work environment. Plaintiffs also have not alleged that they subjectively perceived the work environment to be abusive based on their age. They have not specified the quantity or frequency of the comments, when they were made, by whom, in what tone, or whether they reasonably interfered with their work performance. They have not alleged that any comments were made by their supervisors or anyone connected with decision-making regarding their discipline.

Accordingly, the undersigned respectfully recommends that Plaintiffs' hostile work environment claims based on their age pursuant to the ADEA and the NYSHRL be dismissed.

    c.    *Hostile Work Environment Based on Disability or Medical Leave*

Plaintiffs Suarez, Fukelman, Allen, Gilinsky, and Biton allege claims for hostile work environment under either the FMLA or the ADA. (*Id.* ¶¶ 275-287.) Suarez, Fukelman, and Allen have not alleged that anyone made any comments regarding their medical conditions. Gilinsky alleges a single occasion when he was "harassed" by a "representative of Delta management" about taking FMLA leave, while Biton alleges multiple incidents of similar harassment without providing details as to how often they happened, stating only that management "at times" implied he was abusing his FMLA rights. (*Id.* ¶¶ 229, 251.) These allegations, are, at most, stray remarks.

Accordingly, Plaintiffs' FMLA and ADA hostile work environment claims should be dismissed.

## VI.    **Futility of Amendment**

In response to Delta's latest pre-motion conference letter request, Plaintiffs seek leave to amend the TAC if the Court finds it "in any way defective or insufficiently specific." (Pls. Ltr., Dkt.

43, at 14.)  Delta argues that amending the TAC would be futile.  (Def. Mem. at 2 n.1.)

Amendment of the TAC is governed by Fed. R. Civ. P. 15(a)(2), which states that the Court "should freely give leave [to amend] when justice so requires." *Id.*  Leave to amend should be denied only for undue delay, bad faith, futility of the amendment, or prejudice to the other party. *Gregory v. Inc. Vill. of Ctr. Island*, No. 14-CV-2889 (JFB) (AKT), 2016 WL 4033171, at *10 (E.D.N.Y. July 27, 2016).  Amendment would be futile if it "fails to cure prior deficiencies." *Chunn v. Amtrak,* 916 F.3d 204, 208 (2d Cir. 2019).

When a plaintiff has had multiple opportunities to allege facts sufficient to state a claim after being informed of the deficiencies, including in the opposition to the motion to dismiss, and they have not done so, courts in this Circuit have denied the opportunity to amend on the basis of futility.  *See, e.g., Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (declining to allow plaintiff to file a second amended complaint); *Williams v. Calderoni*, 2012 WL 691832, at *8 (dismissing with prejudice where plaintiff amended complaint once and had "multiple opportunities to allege sufficient specific facts to render his claims plausible, including in the Amended Complaint, at the preliminary injunction hearing, and in his papers opposing the instant motion, and failed to do so."); *see also Harris v. Westchester Cty. Med. Ctr.*, No. 08-CV-1128 (RJH), 2011 WL 2637429, at *4 (S.D.N.Y. July 6, 2011) (dismissing third amended complaint with prejudice); *Treppel v. Biovail Corp.*, No. 03-CV-3002 (PKL), 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) (declining leave to amend after plaintiff "already had two bites at the apple and they have proven fruitless.")

Plaintiffs have already been given four bites at the apple.  Defendant filed four pre-motion conference letters, outlining the deficiencies in Plaintiffs' complaints.  The undersigned held three pre-motion conferences in 2018, heard arguments from both sides regarding deficiencies in the complaint, and allowed amendments after each conference.  In addition, Plaintiffs had the opportunity in their Opposition to propose additional facts to cure deficiencies Delta identified in

the TAC, but they failed to do so.  Any further attempts to amend would truly be fruitless, as there is no apple left for a fifth bite.

Accordingly, the undersigned recommends that Plaintiffs' claims be dismissed with prejudice, without further opportunity to amend.

## CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that Plaintiffs' Third Amended Complaint (Dkt. 37) be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

Any objection to this Report must be filed in writing with the Clerk of Court within fourteen (14) days of service.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to timely file any just objection waives the right to further judicial review of this Report and Recommendation.  *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          April 13, 2020